UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DANIELLE ALTMAN, | CASE NO. 5:22-CV-01546-CEF |
| Plaintiff, | JUDGE CHARLES E. FLEMING |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Danielle Altman challenges the Commissioner of Social Security's denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On September 1, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Sept. 1, 2022). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. Altman filed for DIB and SSI in May 2014, alleging a disability onset date of April 8, 2010. (Tr. 483-95). Her claims were denied initially and on reconsideration. (Tr. 257-82, 285-316). Ms. Altman testified at an administrative hearing before an Administrative Law Judge on January 26, 2016. (Tr. 214-56). On May 25, 2016, the ALJ issued a written decision finding Ms. Altman not disabled. (Tr. 319-48). The Appeals Council granted Ms. Altman's subsequent request for

review and remanded the matter to the ALJ to explain more fully the basis for his conclusions. (Tr. 351-53).

After hearing additional testimony from Ms. Altman (*see* Tr. 183-213), the ALJ issued a second decision on September 6, 2018, finding her not disabled. (Tr. 155-82). After the Appeals Council denied Ms. Altman's request for review (*see* Tr. 2232-38), Ms. Altman filed suit in this Court, resulting in a stipulated order of remand to the Commissioner. (Tr. 2239). Noting the failure to comply with the previous remand order, the Appeals Council again remanded to the ALJ with instructions to give further consideration to the opinion evidence and Ms. Altman's fibromyalgia diagnosis. (Tr. 2244-246). While her civil action was pending, Ms. Altman filed new DIB and SSI applications alleging disability since August 19, 2018. (*See* Tr. 2245, 2248). The Appeals Council's remand order directed the ALJ to consolidate the claims and issue a new decision. (Tr. 2245).

After hearing additional testimony from Ms. Altman (*see* Tr. 2162-2203), a different ALJ issued a third decision on March 2, 2021, finding her not disabled. (Tr. 1932-67). The Appeals Council denied Ms. Altman's request for review, making the 2021 hearing decision the Commissioner's final decision. (Tr. 1917-22; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Ms. Altman timely filed this action on September 1, 2022. (ECF #1).

FACTUAL BACKGROUND

## I. PERSONAL AND VOCATIONAL EVIDENCE

Ms. Altman was 31 years old on the original alleged onset date, and 42 years old at the most recent administrative hearing. (Tr. 257, 2249). She completed tenth grade and does not have a GED. (Tr. 2174). Ms. Altman previously worked as a cashier and a stocker. (Tr. 245-46).

II.    ADMINISTRATIVE HEARING

Ms. Altman testified at three separate administrative hearings in 2016, 2018, and 2020. (Tr. 183-213, 214-56, 2162-203).

A.    2016 Testimony

At the first hearing, Ms. Altman testified she is in pain every day, from the time she gets up until she goes to sleep. (Tr. 239). She does not sleep much because throbbing knee pain often wakes her in the middle of the night. (Tr. 239). She has a limited role in handling household chores: she can vacuum and dust but cannot cook unless she is sitting down, cannot stand at the stove, and cannot stand and lean over the sink to wash dishes for more than 10 to 15 minutes at a time. (Tr. 227-28). She does not do the laundry, located in the basement, because she cannot navigate steps while carrying a load of laundry. (Tr. 228). Her daughters do the laundry and the grocery shopping. (Tr. 228-29).

With the exception of attending doctor's appointments, Ms. Altman does not participate in any activities that get her out of the house regularly. (Tr. 229). She spends her days sitting inside watching television or using a tablet while elevating her legs to ninety degrees and using a heating pad on her back. (Tr. 229-30, 238). She elevates her legs for the majority of the day to relieve knee pain and intermittently lies down in bed to alleviate back pain. (Tr. 230). Because of her back, knee, and hip pain, she is limited to walking half a block before stopping to rest. (Tr. 231).

She takes pain medication that has caused her to gain weight. (Tr. 231). Ms. Altman disclaimed benefits from physical therapy and spinal injections. (Tr. 239-40). She also endorsed neck and shoulder pain, described as less severe than her knee and back pain. (Tr. 234). Her back

3

pain is accompanied by leg pain and is aggravated by physical activity. (Tr. 234). Ms. Altman endorsed wrist numbness and accompanying manipulation and grip issues. (Tr. 238-39).

Ms. Altman also endorsed symptoms of depression, including sadness, loneliness, crying spells, and isolation. (Tr. 235). Three to four times per month, she spends the day isolating in her bedroom. (Tr. 236). When she was employed, she would miss work due to her depression. (Tr. 236-37). Ms. Altman does not drive often and when she does, she drives her daughters to the bus stop and to doctor's appointments. (Tr. 243).

The vocational expert (VE) identified Ms. Altman's past relevant work as a cashier (DOT #211.462-010, light exertion as generally and actually performed, unskilled, SVP 2) and stocker (DOT #929.687-030, heavy exertion as generally performed, medium exertion as actually performed, unskilled, SVP 3). (Tr. 245-46).

### B.    2018 Testimony

During the second hearing, Ms. Altman testified to continued knee and back pain. (Tr. 190-91). She rarely drives because sitting with her knees bent hurts. (Tr. 191). She relies on her daughter's help to shower because she has fallen on multiple occasions. (Tr. 191). She is able to brush her teeth and hair on her own but needs help putting on certain garments, like jeans. (Tr. 191). Pain in her knees and back prevents her from doing most of the household chores, including standing at the sink to wash dishes, loading the dishwasher, and vacuuming. (Tr. 192). Ms. Altman's daughter handles the household shopping. (Tr. 192). Ms. Altman sometimes goes with her but endorsed pain with walking down the stairs to the car, getting into the car, and riding to the store. (Tr. 192).

4

Ms. Altman takes pain medication but has been on it so long that is does not help. (Tr. 193). She has tried Icy Hot, ice packs, and heat without relief. (Tr. 193). Walking, bending, and standing aggravate the pain. (Tr. 193). The pain in her knees is constant whereas the pain in her back comes and goes. (Tr. 193-94). Lying on her back with a heating pad helps relieve the back pain. (Tr. 194).

She uses a cane, prescribed in September 2017, but did not bring it to the hearing because she could lean on her daughter to assist with walking. (Tr. 195). She uses a cane to help with her knees, which lock up and cause her to fall. (Tr. 196). At the hearing, Ms. Altman wore a knee brace. (Tr. 199). Ms. Altman uses a CPAP machine for sleep apnea. (Tr. 196). She has problems sleeping and wakes up during the night. (Tr. 197). She typically naps twice a day for fifteen to twenty minutes at a time. (Tr. 197). She has participated in physical therapy three times, which has "kind of" helped her back, but not her knees. (Tr. 200).

Ms. Altman treats at the Coleman Center for anxiety and depression. (Tr. 198). She is depressed because she has "no life," has gained weight, and is always in pain. (Tr. 198). Medication helps decrease suicidal ideation, though, at times, she still has thoughts that her children would be better off without her. (Tr. 199). She attends weekly therapy appointments and meets with her psychiatrist every couple of months. (Tr. 199). Ms. Altman denied participating in social activities or any activities outside of the home. (Tr. 197-98). She might go out to eat with her daughters once a month. (Tr. 198).

C.    2020 Testimony

Most recently, Ms. Altman testified she lost weight after bariatric surgery in 2018 but gained some of it back because of her pain-related sedentary lifestyle. (Tr. 2174-75). She does not

feel the bariatric surgery improved her conditions because she still has back and knee pain. (Tr. 2175). She estimated she can stand for about fifteen minutes at a time before she must sit down. (Tr. 2176). If she can shift around, she can sit for about an hour without needing to stand up. (Tr. 2180). However, when sitting, Ms. Altman must keep her knees mostly straight. (Tr. 2180). She cannot sit with her feet flat on the floor; she must sit with her heels on the floor and her feet pointing upwards. (Tr. 2180). When she stands from a prolonged seated position, she has to stand in one spot for a few minutes before she can move and then must walk around for 15 minutes to relieve stiffness. (Tr. 2181). When Ms. Altman sits down, she prefers a higher chair because it is easier to stand from a seated position. (Tr. 2181). This sitting-standing-walking routine has been a part of Ms. Altman's routine since about 2015. (Tr. 2182).

She can carry a couple of grocery bags into the house. (Tr. 2178). For the past 18 months, Ms. Altman has been unable to make multiple trips to the car to carry groceries. (Tr. 2179). She does not do any household chores, except for dusting. (Tr. 2190). Ms. Altman's daughter sometimes helps her get into the shower and get dressed if her knees are really bad. (Tr. 2190). She uses a cane to alleviate pain and help with balance when she leaves the house, about five times a month. (Tr. 2190-91). At home, she sometimes uses a cane to navigate stairs but otherwise grabs onto things around the house to ambulate. (Tr. 2191). She can visit the grocery store but limits the amount of time she spends in stores because she is in pain and does not want to be around others. (Tr. 2192).

When she writes for a long period of time, Ms. Altman experiences a little bit of pain in the right hand. (Tr. 2180). Her hand feels like it is falling asleep, and she gets shooting pains. (Tr. 2193). She drops items, like pots, pens, and medication, because her hand "gives out." (Tr. 2194-

95). She has difficulty reaching overhead and feels a stretching sensation at the bottom of her back. (Tr. 2180). Since 2017, Ms. Altman has experienced fibromyalgia flare-ups that cause widespread pain and sensitivity. (Tr. 2187). During these flare-ups, Ms. Altman lies down and isolates in her room for a couple of hours. (Tr. 2187).

VE Brett Salkin then testified. He revised the previously identified stocker position to warehouse worker and laborer and determined Ms. Altman also worked as a packager (DOT #920.587-018, medium exertion as generally and actually performed, unskilled, SVP 2). The ALJ asked VE Salkin if a hypothetical individual of Ms. Altman's age, education, and work experience could perform Ms. Altman's past relevant work if restricted to light exertion work and further limited as follows: never climb ladders, ropes, or scaffolds; frequently climb ramps and stairs; frequently stoop and crawl; never use moving machinery; no exposure to unprotected heights; no commercial driving; perform simple, routine, and repetitive tasks that can be performed at the SVP 1 or 2 level; no fast-paced production requirements; limited to routine workplace changes; occasionally interact with the public; and occasionally have superficial interaction with coworkers, meaning no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others. (Tr. 2197). VE Salkin responded the hypothetical individual could not perform Ms. Altman's past relevant work but identified three positions the individual could perform: housekeeper (DOT #323.687-014, 134,000 jobs in the national economy), food service worker (DOT #311.677-010, 105,000 jobs in the national economy), and price marker (DOT #209.587-034, 90,000 jobs in the national economy). (Tr. 2198). The hypothetical individual could perform the same positions if further limited to occasionally climbing ramps and stairs; occasionally balance, stoop, kneel, and crouch,

but never crawl; and occasional exposure to fumes, odors, dusts, gases, and poorly ventilated areas. (Tr. 2198-99).

The VE identified three other positions the hypothetical individual could perform if restricted to sedentary exertion: document preparer (DOT #249.587-018, 25,000 jobs in the national economy), table worker (DOT #739.687-182, 2,800 jobs in the national economy), and film touchup inspector (DOT #726.684-050). (Tr. 2199). The individual could perform the same positions if she required a sit/stand option allowing her to sit for one hour and stand for five minutes. (Tr. 2200). If the individual needed to walk for 15 minutes after standing for 5 minutes, the individual could not perform the identified sedentary positions. (*Id.*).

All previously identified positions remain available to the hypothetical individual if further restricted to frequently handling and fingering objects with the right hand. (Tr. 2200-01). However, no jobs are available to a hypothetical individual if further limited to occasional handling and fingering with the right hand. (Tr. 2201). A hypothetical individual who requires a cane for balance and ambulation is precluded from performing light exertion positions but can perform the identified sedentary positions. (Tr. 2202). To maintain employment, an individual must remain on task for 90% of the workday. (Tr. 2201).

## III. RELEVANT MEDICAL EVIDENCE

In March 2014, Ms. Altman established care with Isabelle Lane, D.O., complaining of low back pain, with occasional radiation down the right leg, worse in the morning. (Tr. 624). She reported aggravation with activity and minimal relief with gabapentin. (*Id.*). Ms. Altman also endorsed having no energy and wanting to sleep often. (*Id.*). Dr. Lane noted a slightly antalgic gait and minimal tenderness to palpation at the lumbosacral junction. (Tr. 625). Dr. Lane prescribed

Wellbutrin and prednisone, ordered lumbar X-rays, and referred Ms. Altman to physical therapy.

(Tr. 626). X-rays revealed mild disc space narrowing at L4-L5. (Tr. 643).

On April 25, 2014, Ms. Altman returned to Dr. Lane and reported she was unable to

complete physical therapy because she fell out of her bathtub two weeks ago and had pain in her

entire back. (Tr. 630). She was unsure if the Wellbutrin was helping. (*Id*.). Ms. Altman did not

have tenderness to palpation. (Tr. 631). Dr. Lane added escitalopram oxalate to help her mood.

(*Id*.).

In May, Ms. Altman reported increased neck pain since the last office visit. (Tr. 633). She

also stated her mood was well-controlled, she had more motivation, and she was tolerating the

medications well. (*Id*.). Physical examination revealed a slightly antalgic gait, slightly decreased

spinal range of motion with rotation, mild spasm in the left trapezius muscle, positive SLR

bilaterally, and multiple tender points in the upper and lower spine. (Tr. 634). Dr. Lane ordered a

lumbar MRI, prescribed tizanidine HCL (Zanaflex), Vicodin, and meloxicam (Mobic), and

continued Ms. Altman's prescriptions for escitalopram, gabapentin, and Wellbutrin. (Tr. 634-35).

In June, after four months of physical therapy, Ms. Altman felt her back was getting worse.

(Tr. 687). The physical therapist recommended water therapy. (*Id*.). On June 16, 2014, Ms. Altman

met with Dr. Lane and reported no improvement in her back pain. (Tr. 670). She also endorsed

not sleeping well because of the pain. (*Id*.). Ms. Altman felt her mood was fairly controlled with

medication but continued to endorse low motivation and presented with a flat affect. (Tr. 670-71).

Physical examination revealed bilateral mild trapezius muscle spasms. (Tr. 671). Dr. Lane increased

the escitalopram dosage. (*Id*.). On July 21, Ms. Altman endorsed a fluctuating mood and

widespread pain, and displayed a slightly antalgic gait and diffuse tenderness to palpation along the bilateral paravertebral musculature of the lumbar and thoracic spine. (Tr. 673-74).

On July 29, 2014, Ms. Altman met with Elise Leone, CRNP, at the Pain and Spine Institute, complaining of moderate left cervical spine pain radiating into the left shoulder and severe lumbar spine pain radiating into both legs. (Tr. 748). Ms. Altman stated her neck pain is aggravated by movement and improved with ice and pain medication; her low back pain is aggravated by walking, standing, and sitting, and improved with lying down, using a heating pad, and pain medication. (Tr. 748). On examination, Ms. Altman had painful left shoulder range of motion, trigger points, moderately restricted cervical spine range of motion, an unsteady gait, increased paraspinous muscle tone, tenderness to palpation of the lumbar spine and SI joint, increased pain with facet loading, positive SLR on the left, restricted and painful lumbar spinal range of motion, and slightly diminished strength in the left knee and ankle. (Tr. 751-53). NP Leone recommended chiropractic care and massage with David P. Leone, D.C., for lumbar and neck tension, refilled prescriptions for meloxicam and tizanidine, ordered an MRI to assess better Ms. Altman's complaints of radicular pain, and directed her to follow up with Bina Mehta, M.D., for trigger point injections. (Tr. 754). The MRI, performed August 21, 2014, revealed mild facet degenerative hypertrophy at L3-L4 and L4-L5, mild canal stenosis and mild bilateral neural foraminal narrowing at L4-L5, and a small posterior disc bulge at L5-S1 with minimal facet degenerative hypertrophy. (Tr. 698-99).

Ms. Altman saw chiropractor Dr. Leone on August 22, 2014 and described similar low back symptoms. (Tr. 756). Physical examination revealed an unsteady gait, increased lumbar paraspinous muscle tone, lumbar spasm, tenderness to palpation at the lumbar spine and SI joint,

pain with facet loading, pain with palpation to the bilateral greater trochanter, buttock, and SI joints, a positive SLR on the left, limited and painful lumbar range of motion, and slightly decreased strength in the left knee, ankle, and foot. (Tr. 759). On that day, Ms. Altman also received a left trapezius trigger point injection. (Tr. 762).

Ms. Altman met with Dr. Mehta on September 10, 2014, complaining of fluctuating mild-moderate pain in the middle and lower back with radiation to the bilateral buttocks. (Tr. 765). Ms. Altman also described radiating pain into the front of the legs and the feet. (*Id.*). At times, the pain in her lumbar spine, described as aching and burning, wakes her from sleep. (*Id.*). Otherwise, Ms. Altman endorsed headaches, anxiety, depression, and insomnia. (Tr. 766-67). Ms. Altman reported the cervical trigger point injection helped for about two days and the gabapentin (900mg in the morning, 300mg at night) did not work well. (Tr. 765). Physical examination revealed an unsteady gait, increased paraspinous muscle tone, moderate lumbar spasms, bilateral lumbar and paraspinous tenderness, pain with palpation of the bilateral greater trochanter, buttock, and SI joints, limited and painful lumbar range of motion, and increased pain with facet loading. (Tr. 767-68). Dr. Mehta described the MRI results as "essentially fine." (Tr. 768). She changed Ms. Altman's gabapentin dose to 600mg three times per day and directed her to schedule an appointment with Dr. Leone for chiropractic care. (Tr. 768).

Ms. Altman met with Dr. Leone on September 23, 2014 for chiropractic manipulation and complained of mid and lower back pain radiating into the bilateral thighs, calves, and feet, aggravated by daily activities and movement, improved with ice and pain medication. (Tr. 770). Ms. Altman reported benefit from an increase in her pain medication and chiropractic therapy.

11

(*Id.*). Physical examination revealed similar findings to those Dr. Mehta found during the previous visit. (Tr. 773).

On October 14, 2014, Ms. Altman met with Dr. Mehta and complained of left cervical neck pain with radiation into the left shoulder. (Tr. 775). She also complained of low back pain radiating into the bilateral legs, associated with numbness and tingling, aggravated by daily activities, and improved with heat. (*Id.*). She reported the increased dose of gabapentin helped with the pain. (*Id.*). Dr. Mehta noted trigger points at the left trapezius, shoulder, pericervical, and periscapular muscles. (Tr. 778). Physical examination also revealed restricted cervical range of motion, unsteady gait, increased paraspinous muscle tone, lumbar spasm, tenderness to palpation of the lumbar paraspinous muscles, increased pain with facet loading, pain with palpation to the greater trochanter, buttock, and SI joints, limited and painful lumbar range of motion, and decreased sensation to light touch at L4 on the right side. (Tr. 778-79). Dr. Mehta refilled Ms. Altman's prescriptions and scheduled a trigger point injection. (Tr. 780).

Ms. Altman returned to Dr. Mehta's office in November 2014 with similar complaints. (Tr. 791). A lower extremity EMG was normal. (*Id.*). She reported some pain relief with the increased dose of gabapentin. (*Id.*). Ms. Altman also felt the trigger point injections were helpful and requested additional injections for the left hip and neck. (*Id.*). She declined back injections out of fear. (*Id.*). Physical examination revealed similar findings to the previous office visit. (Tr. 794-95). Dr. Mehta administered four trigger point injections and prescribed Topomax. (Tr. 796). In light of the mild MRI findings and negative EMG, Dr. Mehta concluded Ms. Altman was not a good opioid candidate and instructed her to wean off of gabapentin. (*Id.*).

On November 11, 2014, Ms. Altman met with Dr. Lane and described an improved mood but difficulty falling and staying asleep and feeling tired during the day. (Tr. 708). Dr. Lane prescribed trazodone. (Tr. 709). Ms. Altman returned to Dr. Lane on December 9, 2014 with improved sleep. (Tr. 711). She reported well-controlled anxiety but a more depressed mood. (*Id.*). Dr. Lane discontinued escitalopram, prescribed Cymbalta, and referred Ms. Altman to a Functional Capacity Evaluation. (Tr. 712-13).

On December 17, 2014, Ms. Altman met with Karen D. Hodakievic, CRNP. (Tr. 798). Ms. Altman complained of achy, bilateral upper extremity pain, moderate to severe, improved with rest, lying down, and heat. (*Id.*). Physical examination revealed decreased cervical range of motion, antalgic gait, tenderness at the bilateral shoulders and trapezius muscles, mild lumbar spasm, tenderness at the bilateral lumbar paraspinous and gluteal muscles, and decreased and painful lumbar range of motion. (Tr. 800-01).

Ms. Altman had therapy sessions with psychologist Cathy Kane, Ph.D., in September, October, November, and December of 2014. (Tr. 840-44).

Ms. Altman saw Dr. Lane again on January 2, 2015, where she reported increased headaches, a worsening mood, little motivation, and uncontrolled pain. (Tr. 714). Dr. Lane noted Ms. Altman was tearful and displayed a flat affect. (Tr. 715). Ms. Altman returned on January 8 and reported significant numbness and pain in her heels with prolonged sitting and tingling in the hands. (Tr. 717). Physical examination revealed a positive Tinnel's sign bilaterally and a flat affect. (Tr. 718). Dr. Lane prescribed hydroxyzine for anxiety and insomnia and wrist splints for carpal tunnel syndrome with instructions to avoid aggravating movements. (*Id.*).

13

A February 2015 EMG study showed no evidence of radiculopathy, neuropathy, or peripheral nerve entrapment. (Tr. 827-28).

On March 4, 2015, Ms. Altman met with NP Hodakievic and complained of worsening lumbar pain that she described as aching, burning, deep, shooting, and stabbing. (Tr. 821). She reported aggravation with bending, daily activities, and walking, and improvement with heat and pain medication. (*Id.*). Physical examination revealed pain with palpation to the right SI joint, bilateral back pain with SLR testing, antalgic gait, and decreased lumbar range of motion. (Tr. 823-24). NP Hodakievic increased the dose of Topamax and ordered SI joint injections, administered on March 17. (Tr. 824-25, 878).

On March 23, 2015, Ms. Altman attended a diagnostic mental health assessment at the Coleman Professional Services. (Tr. 996). She described feeling anxious around people and when driving on the highway. (*Id.*). She endorsed feeling nauseous while sitting in the waiting room before her assessment. (*Id.*). She also reported difficulty sleeping and low motivation. (*Id.*). Mental status examination revealed cooperative behavior, avoidant eye contact, and constricted affect. (Tr. 1010). Ms. Altman reported some difficulties with concentration, but these were not observed on assessment. (Tr. 1011). She was diagnosed with recurrent major depressive disorder, generalized anxiety disorder, social phobia, and obsessive-compulsive disorder. (Tr. 1015).

On March 24, 2015, Ms. Altman met with primary care physician Lonna Safko, M.D., to establish care. (Tr. 1150). She reported chronic low back pain aggravated by exertion, feeling depressed and having low energy, and zoning out more frequently. (*Id.*). She reported fatigue, muscle weakness, paresthesia, stiffness, and numbness and tingling in the hands and feet. (*Id.*). Ms. Altman also noted the decreased effectiveness of Topamax. (Tr. 1151). Physical examination was

14

largely normal except Ms. Altman endorsed pain with range of motion testing and substantial pain lifting both knees. (Tr. 1155). Dr. Safko directed Ms. Altman to wean off Cymbalta, increased her dose of Trazodone, and prescribed Viibryd and Miralax. (Tr. 1156).

On April 1, 2015, Ms. Altman returned to the Spine and Pain Institute with fluctuating lumbar pain, moderate to severe and described as sharp, throbbing, and shooting, that radiates into the right SI joint, and significantly aching knees. (Tr. 880). She identified walking and bending as aggravating factors, improved with rest and lying down. (*Id.*). The SI joint injection did not provide relief. (*Id.*). Ms. Altman again reported concern that Topamax was not as effective. (*Id.*).

Physical examination revealed pain at the right SI joint, bilateral back pain with SLR testing, tender bilateral paraspinous muscles, increased pain with facet loading, and restricted range of motion. (Tr. 881-82). NP Hodakievic ordered bilateral knee X-rays and prescribed Pennsaid, a topical pain cream, for knee pain. (Tr. 883-84). Knee X-rays showed small patellar enthesophytes in both knees and joint effusion in the left knee. (Tr. 875).

On April 10, 2015, Ms. Altman attended an initial psychiatric evaluation with CNP Linda Cunningham. (Tr. 990). There, she endorsed low motivation, constant fatigue, fair sleep, poor appetite, and significant symptoms of anxiety when driving or in social situations, including racing heart, sweaty hands, and fuzzy vision. (*Id.*). Mental status examination revealed cooperative demeanor, full affect, and unremarkable cognitive impairment. (Tr. 991-92). NP Cunningham prescribed Effexor, Buspar, trazodone, and Vistaril for anxiety. (*Id.*)

On April 30, 2015, Ms. Altman saw Dr. Mehta with complaints of low back and right knee pain. (Tr. 886). On examination, Ms. Altman endorsed tenderness to palpation of the SI joint and

the thoracic and lumbar paraspinous muscles, increased pain with facet loading, positive bilateral SLR testing, and painful and limited lumbar range of motion. (Tr. 889). Dr. Mehta ordered a thoracic MRI and noted she did not understand why Ms. Altman was having such severe pain given her prior imaging studies. (Tr. 890).

On May 1, Ms. Altman returned to NP Cunningham and reported pain as a significant stressor. (Tr. 984). She noted some improvement in mood and anxiety and better sleep with fewer interruptions. (*Id.*). Mental status examination was normal. (Tr. 985-86). NP Cunningham discontinued Buspar due to complaints of itchiness and continued her other mediations. (Tr. 988). On May 11, Ms. Altman told NP Cunningham she was doing well and only had anxiety when driving. (Tr. 978).

On June 5, 2015, Ms. Altman attended a pain management assessment with Joseph Abdelmalak, M.D. (Tr. 1092). She reported back pain radiating into both lower extremities, aggravated by sitting, standing, forward flexion, lifting, and walking, and improved with heat and lying on her side. (Tr. 1093). Physical examination revealed widespread multiple trigger point tenderness, tenderness over the cervical and lumbar spine, reproducible pain with spinal extension, tenderness over the right SI joint, and right knee pain with range of motion testing. (Tr. 1095). Gait, motor strength, and sensory testing were normal. (*Id.*). Dr. Abdelmalak prescribed gabapentin, nortriptyline, and disclofenac, and referred Ms. Altman to water therapy. (Tr. 1096).

Ms. Altman received four trigger point injections on June 12 (Tr. 1034) and July 9 (Tr. 1042), and two trigger point injections on July 31 (Tr. 1053).

On June 24, 2015, Ms. Altman attended a physical therapy spine evaluation with physical therapist Timothy Nugent. (Tr. 1102). Ms. Altman reported low back pain radiating down the legs

and into the feet, aggravated by standing, bending, squatting, and walking, improved with lying down, medications, and heat. (*Id.*). PT Nugent observed her gait and noted decreased bilateral knee flexion. (Tr. 1103). Otherwise, physical examination revealed moderately restricted lumbar range of motion, and tenderness to palpation of the lumbar paraspinous muscles and bilateral anterior knees. (Tr. 1104).

On July 22, 2015, Ms. Altman told NP Cunningham she felt very overwhelmed and irritable. (Tr. 1061). Mental status examination was otherwise unremarkable. (*See* Tr. 1062).

On August 6, 2015, Ms. Altman met with Dr. Abdelmalak, reporting continued low back and thoracic pain radiating into the legs, exacerbated by forward flexion, walking, bending, and daily activities, improved with lying down and using heat. (Tr. 1121). Ms. Altman displayed tenderness to palpation of the lumbar spine and the bilateral SI joints, right knee pain with range of motion testing, and normal gait. (Tr. 1123). Dr. Abdelmalak increased the dose of nortriptyline, continued her other medications, and referred her for water therapy. (Tr. 1124).

Ms. Altman returned to Dr. Abdelmalak's office on October 8, 2015, complaining of back pain and continuous, aching bilateral knee pain. (Tr. 1132). Physical examination revealed similar abnormal findings to the previous office visit. (Tr. 1135). Dr. Abdelmalak directed Ms. Altman to wean off gabapentin and start Zanaflex, encouraged her to pursue water therapy, and continued her other medications. (Tr. 1136). On November 6, 2015, she complained of neck and right shoulder pain, exacerbated by lifting and rotating her head, improved with ice and heat. (Tr. 1141-42). She also reported continued back pain radiating to the legs and bilateral knee pain. (Tr. 1145). Again, physical examination revealed similar abnormal findings. (Tr. 1144). Dr.

Abdelmalak recommended water therapy and participation in a chronic pain rehabilitation program. (Tr. 1145).

On November 13, 2015, Ms. Altman reported depression and inability to concentrate. (Tr. 1074).

On December 4, 2015, Ms. Altman returned to the Spine and Pain Institute with complaints of back pain, neck pain radiating to the right shoulder, and bilateral knee pain, aggravated by bending and walking, improved with heat, ice, and medications. (Tr. 1325). She also noted popping in her knees when walking. (*Id.*). Physical examination revealed trigger point tenderness, painful right SI joint, antalgic gait, tenderness to the bilateral lumbar and thoracic paraspinous muscles, increased pain with facet loading, and restricted and painful lumbar range motion. (Tr. 1328). For chronic SI joint inflammation and right knee pain, NP Leone ordered injections, discontinued tizanidine and replaced it with Robaxin, and prescribed Lyrica to treat fibromyalgia. (Tr. 1328). On December 14, her right knee joint was aspirated, and she received an injection at the prepatellar bursa. (Tr. 1334). She received the SI joint injection on December 29. (Tr. 1339).

A lumbar MRI, dated February 19, 2016, showed very mild changes compared to the August 2014 study, with mild degenerative changes at the SI joints, mild prominence of the epidural fat and mild overall narrowing of the central canal at L5-S1, a subtle disc bulge at L4-L5 contributing to minimal encroachment on the lateral recesses, mild narrowing of the central canal, and minimal neural foraminal narrowing. (Tr. 1356).

Ms. Altman returned to the Institute on February 24, 2016, and complained of worsening cervical, lumbar, and bilateral knee pain. (Tr. 1346). She reported increased cervical pain with

movement and lying on her right side, improved with heat, and increased lumbar pain with bending, standing and walking, improved with heat and lying down. (*Id.*). Ms. Altman described the knee pain as aching and sharp, aggravated by standing and walking. (Tr. 1346-47). She reported Pennsaid (diclofenac) used to work for knee pain but no longer helps. (Tr. 1347). Physical examination revealed decreased cervical range of motion and trigger point tenderness. (Tr. 1349). She received an increased dose of Lyrica and was scheduled for additional trigger point injections. (Tr. 1350).

In March 2016, Ms. Altman saw NP Cunningham and reported irritability and being argumentative with her family, continued feelings of anxiety in social situations, and continued chronic pain that significantly contributed to her depression. (*See* Tr. 1372).

On March 22, 2016, Ms. Altman saw Dr. Safko and complained of right neck, shoulder, and wrist pain, described as a pinching sensation in the shoulder. (Tr. 1791). She also reported low back pain radiating into the legs, depression, fatigue, muscle weakness, and numbness and tingling in the right hand. (*Id.*). On examination, Ms. Altman had tenderness in the right shoulder and was unable to adduct greater than 90 degrees or reach behind her. (Tr. 1797). Dr. Safko diagnosed a sprain of the right rotator cuff capsule, ordered physical therapy for the shoulder, and increased her dose of nortriptyline. (Tr. 1798).

On March 28, 2016, Ms. Altman received four trigger point injections. (Tr. 1323). Due to weight gain, NP Hodakievic directed Ms. Altman to wean off Lyrica and restart Topamax. (*Id.*).

On May 9, 2016, she saw Heather Shahan, Clinical Nurse Specialist, , and reported more depression and poor sleep. (Tr. 1372). She was depressed, tearful, and displayed attention and

concentration impairments. (Tr. 1374). Nurse Shahan increased her dose of Effexor, decreased her dose of mirtazapine, and continued her prescriptions for Vistaril and Abilify. (Tr. 1377).

On May 12, 2016, Ms. Altman saw David Kocenda, NP, and reported lumbar back pain with associated tingling in the low back and extremities. (Tr. 1305). Physical examination revealed decreased lumbar range of motion and bilateral SI joint tenderness. (Tr. 1307). NP Kocenda increased her dose of Topamax. (Tr. 1308).

On July 7, 2016, Ms. Altman met with NP Hodakievic and complained of muscle weakness and more right shoulder and bilateral foot pain. (Tr. 1412). She reported the Topamax helped. (*Id.*). Physical examination revealed decreased range of motion, tenderness, pain, and decreased strength in the right shoulder and tenderness bilaterally on the soles of her feet. (Tr. 1414). NP Hodakievic prescribed Voltaren for pain and ordered X-rays for the right shoulder and feet. (Tr. 1415). X-ray of the right shoulder showed mild degenerative changes of the acromioclavicular joint. (Tr. 1303). X-rays of the feet revealed a right posterior calcaneal enthesophyte. (Tr. 1304).

Ms. Altman returned to NP Hodakievic on July 27 with continued lumbar pain. (Tr. 1405). She reported resolution of her shoulder pain with Voltaren and exercises but increased bilateral foot pain and noted her left leg gives out. (*Id.*). On physical examination, NP Hodakievic observed decreased lumbar range of motion with tenderness, pain, and spasm; left leg weakness and abnormal, asymmetrical patellar and Achilles reflexes; and antalgic gait. (Tr. 1407). She also noted Ms. Altman had failed NSAID, physical therapy, and chiropractic treatment. (Tr. 1408). NP Hodakievic ordered an updated lumbar MRI and lower extremity EMG. (*Id.*). The MRI revealed findings similar to the prior study, including mildly to moderately arthritic facet joints with increased epidural fat narrowing of the thecal sac at L5-S1; a slight loss of signal intensity of the

disc with minimal bulge, mildly arthritic facet joints, and increased epidural fat posteriorly

narrowing the thecal sac at L4-L5. (Tr. 1301).

In August 2016, Ms. Altman returned to Nurse Shahan and reported feeling "numb and

tired" rather than depressed. (Tr. 1379). She endorsed anxiety when leaving the house and having

panic attacks in the car. (*Id.*). Mental status examination revealed impaired attention and

concentration but was otherwise unremarkable. (Tr. 1380-81). Nurse Shahan discontinued

mirtazapine and Vistaril because they were not helping, prescribed propranolol for anxiety and

doxepin for sleep, and continued Ms. Altman's prescriptions for Effexor and Abilify. (Tr. 1384). In

September 2016, she continued to endorse sleep issues, depression, low energy, and no

motivation. (Tr. 1386). She was tearful and mental status examination was notable for impaired

attention and concentration. (Tr. 1387-88). Nurse Shahan increased Ms. Altman's dose of Effexor.

(Tr. 1391). In December 2016, she continued to report feeling stressed and anxious. (Tr. 1471).

On December 28, 2016, Ms. Altman underwent a second aspiration of the right knee and

received another injection, resulting in significant pain reduction immediately following the

procedure. (Tr. 1514).

On March 2, 2017, Ms. Altman met with Dr. Abelmalak and complained of bilateral knee

pain, described as aching and burning, exacerbated by movement, bending over, and climbing

stairs and improved with lying down and ice. (Tr. 1431). She also endorsed lower back pain

radiating to the right buttock area, exacerbated by standing, forward flexion, and walking and

improved with lying down, pain medication, and heat, and numbness in her hands and feet. (Tr.

1434-35). Ms. Altman claimed the knee injections provided only minimal pain relief. (Tr. 1435).

Physical examination revealed greater than fourteen tender trigger points all over Ms. Altman's body; tenderness over the trapezius muscles, lumbar spine, and bilateral paraspinous muscles; and pain with knee range of motion testing. (*Id*.). Dr. Abdelmalak prescribed Celebrex, continued her other medications, and suggested participating in a chronic pain rehabilitation program. (Tr. 1435). Dr. Abdelmalak observed similar findings on Ms. Altman's next appointment in April 2017. (Tr. 1443-44). He prescribed Zanaflex, discontinued Robaxin, continued her other medications, and referred her to the Bariatric Institute for weight loss. (Tr. 1445).

On March 28, 2017, Ms. Altman reported continued stress at home and not sleeping well. (Tr. 1478). Mental status examination was remarkable for an anxious mood and impaired attention and concentration. (Tr. 1480). On July 25, Nurse Shahan discontinued Abilify and prescribed Rexulti for depression. (Tr. 1489).

On July 12, 2017, Ms. Altman saw Dr. Safko and reported lying in bed with a heating pad and snacking all the time because the pain makes her want to eat. (Tr. 1591). She also endorsed feeling sad. (*Id*.). On August 29, 2017, Ms. Altman complained of bilateral knee pain, worse on the left because she fell out of bed that morning and hit her knee. (Tr. 1565). Ms. Altman identified associated signs and symptoms, including fatigue, gait disturbance, disturbed sleep, joint swelling and swelling in the legs and feet, muscle weakness, paresthesia, decreased range of motion, stiffness, chills, and numbness and tingling in the feet. (*Id*.). She noted her pain was exacerbated by walking and bending, improved with recumbency and rest. (*Id*.).

Physical examination revealed left knee medial tenderness, swelling, and decreased range of motion, musculoskeletal effusions, and pain with range of motion testing. (Tr. 1571). Dr. Safko instructed Ms. Altman to continue elevating the left leg, ordered a knee MRI, prescribed Percocet,

referred her to physical therapy for treatment and a functional capacity evaluation, and referred her for a consultation for neuropathy. (Tr. 1572). On September 8, 2017, Ms. Altman returned to Dr. Safko's office and complained of knee pain exacerbated by walking and bending and improved with recumbency and rest, with associated fatigue, gait disturbance, disturbed sleep, joint swelling, muscle weakness, paresthesia, decreased range of motion, stiffness, and numbness and tingling in the feet. (Tr. 1556). Ms. Altman's left knee displayed medial tenderness, swelling, and decreased range of motion. (Tr. 1562). Dr. Safko's notes indicate she prescribed a cane for Ms. Altman. (Tr. 1563).

On September 5, 2017, Ms. Altman met with pain medicine physician Robert Dallara, M.D., and complained of low back pain traveling into the bilateral lower extremities along the L5-S1 dermatomes, exacerbated by activities of daily living, walking, standing, bending, and twisting, alleviated by rest, heat, and medications. (Tr. 1608-09). Dr. Dallara noted Ms. Altman could rise from a seated to standing position without significant push off and a non-antalgic gait. (Tr. 1612). Physical examination also revealed positive bilateral facet loading maneuvers, tenderness to palpation of the paraspinous muscles, and positive SLR testing bilaterally on the L5-S1 dermatome. (*Id.*). Dr. Dallara reviewed Ms. Altman's 2016 lumbar MRI and noted severe facet arthropathy at the L5-S1 level, minor facet arthropathy at L4-L5, and mild stenosis at L5. (*Id.*). Dr. Dallara determined Ms. Altman's pain stemmed from components of facet arthropathy as well as bilateral lumbar radiculopathy consistent with an L5-S1 dermatomal distribution. (Tr. 1613). He suggested a lumbar epidural steroid injection at the L5-S1 level. (*Id.*).

Ms. Altman's left knee MRI, dated September 7, 2017, revealed "[f]ree range blunting of the body of the medial meniscus with mucoid degeneration and peripheral extrusion of the body

23

of the medial meniscus," "[t]ricompartmental degenerative change of the knee, moderate to severe in the medial femorotibial joint space[.] Mild edema in the periphery of the medial tibial plateau is likely reactive from the degenerative change," and "[s]mall volume knee joint effusion." (Tr. 1538). Ms. Altman's left knee X-ray, dated September 18, 2017, showed medial compartment narrowing and tricompartmental degenerative spurring, increase from the prior examination, and a small suprapatellar effusion. (Tr. 1536).

On September 18, 2017, Ms. Altman met with J. Martin Leland, M.D., an orthopedic specialist, to discuss her left knee pain. (Tr. 1880). Dr. Leland reviewed the September X-ray and MRI and noted moderate to severe medial and patellofemoral compartment arthritis. (Tr. 1884). On examination, Dr. Leland observed positive patellar grind in the left knee and noted tenderness over the medial joint line. (Tr. 1883). He recommended and administered a knee injection that day, prescribed naproxen as needed, and referred Ms. Altman for physical therapy. (Tr. 1884).

On September 21, 2017, Ms. Altman received a lumbar epidural steroid injection at L5-S1. (Tr. 1541-42).

On January 5, 2018, Ms. Altman saw Dr. Safko and complained of back and bilateral knee pain with swelling in the left knee. (Tr. 2436-37). Physical examination revealed tenderness over the right SI joint, medially in the left knee, and a positive SLR test on the right. (Tr. 2442).

On May 1, 2018, Ms. Altman underwent bariatric bypass surgery and, by June 12, had lost 35 pounds and was exercising more. (Tr. 2462).

On September 11, 2018, Dr. Dallara prescribed tramadol and administered trigger point injections. (*See* Tr. 2498-99). On December 4, 2018, Dr. Dallara found positive bilateral facet loading maneuvers, tenderness to palpation of the paraspinous muscles, and positive bilateral SLR

24

testing. (Tr. 2503). Dr. Dallara noted Ms. Altman's inability to use NSAIDs after bariatric surgery, recommended additional trigger point injections, and suggested a bilateral lumbar rhizotomy. (Tr. 2505-06).

On December 6, 2018, Ms. Altman saw Dr. Safko and complained of knee pain and memory trouble possibly from taking sleeping pills, melatonin, and doxepin. (Tr. 2479). She reported her pain was aggravated by walking and bending, relieved with recumbency and rest. (*Id.*). Dr. Safko discontinued Ms. Altman's prescription for Lyrica and prescribed gabapentin. (Tr. 2486).

On December 21, 2018, Ms. Altman followed up with Dr. Safko after a motor vehicle accident and complained of right upper back pain with radiation to the right shoulder, flank, and hand, aggravated by exertion and relieved with the use of a warm compress. (Tr. 2470). Physical examination was remarkable for tenderness and decreased range of motion in the right shoulder and tenderness over the right SI joint. (Tr. 2476). Dr. Safko prescribed methylprednisone and directed Ms. Altman to continue using heat and chiropractic care for relief. (Tr. 2478).

In January 2019, Ms. Altman saw Dr. Leland for left knee pain, primarily of the medial aspect. (Tr. 2563). She had tenderness over the medial joint line and the lateral joint line with full range of motion. (Tr. 2567). Dr. Leland scheduled her for a left knee scope, partial meniscectomy, and microfracture. (*Id.*). Ms. Altman returned to Dr. Leland's office six days after the procedure and stated she was doing well, and the pain was gradually improving. (Tr. 2568).

In February 2019, Ms. Altman contacted the Bair Foundation to begin in-home mental health counseling to manage and reduce her symptoms. (Tr. 2552).

On March 7, 2019, Ms. Altman returned to Dr. Dallara's office after a left lumbar rhizotomy and reported 80% pain relief. (Tr. 2520). Ms. Altman endorsed continued knee pain after she underwent the February 2019 left knee scope. (*Id.*). She underwent a right lumbar rhizotomy on March 11, 2019, with 100% pain relief. (*See* Tr. 2677). Ms. Altman's low back pain returned in August 2019, prompting her to seek a neurosurgical consultation with Jason Eubanks, M.D., who recommended nonsurgical interventions of physical therapy and home exercise. (Tr. 2598).

On December 6, 2019, Ms. Altman returned to her pain management physician's office and met with Mary Penkala, APRN-CNS, APRN-CNP, with low back pain radiating to the top of the buttocks and the mid-back. (Tr. 2605). She endorsed 40-45% pain relief with the use of tramadol. (*Id.*). Ms. Altman also reported some recent falls where she landed on her hip and face but did not go to the emergency room. (*Id.*). Physical examination revealed trigger point and paraspinous musculature tenderness in the cervical spine, paraspinous musculature tenderness in the lumbar spine and increased pain with extension, positive bilateral facet loading maneuvers, positive bilateral SLR testing on the L5-S1 dermatome, and right hip tenderness. (Tr. 2610-11).

 On February 26, 2020, Ms. Altman met with NP Penkala with continued low back pain radiating to the top of the buttocks and the midback and new bilateral hip pain, exacerbated by daily activities. (Tr. 2597). Ms. Altman said she could not do physical therapy due to a transportation issue. (Tr. 2598). Physical examination revealed similar findings from her previous visit. (Tr. 2601-02). Ms. Altman declined repeat rhizotomies. (Tr. 2603). NP Penkala continued her prescriptions for tramadol and gabapentin and prescribed tizanidine for increased muscle spasms.

26

(Tr. 2604). On May 4, 2020, during a telehealth appointment, NP Penkala discontinued tizanidine because it caused headaches and prescribed Robaxin for muscle spasms. (Tr. 2870, 2876).

On April 28, 2020, Ms. Altman told Nurse Shahan she was doing all right and felt counseling with the Bair Foundation was helpful. (Tr. 2693). She endorsed increased anxiety due to stress in her marriage. (*Id.*).

IV. **MEDICAL OPINIONS**

*Physical Impairments*

On July 5, 2014, William Bolz, M.D., a state agency medical consultant, reviewed Ms. Altman's records and determined she could lift and carry up to twenty pounds occasionally, ten pounds frequently; stand and/or walk and sit for six hours each in an eight-hour workday; frequently climb ramps and stairs but never climb ladders, ropes, or scaffolds; frequently stoop and crawl; and must avoid all exposure to unprotected heights. (Tr. 263-64). The ALJ gave great weight to Dr. Bolz's opinion because it was consistent with the evidence, including an "essentially normal" spinal X-ray and intact strength and sensation. (Tr. 1946).

On October 17, 2014, Elizabeth Das, M.D., adopted Dr. Bolz's opinion and added a limitation to occasional overhead reaching to account for cervical spine issues and some limited range of motion in the left shoulder. (Tr. 293-95). The ALJ gave great weight to Dr. Das's opinion to the extent it was consistent with Dr. Bolz's opinion but gave less weight to the opinions regarding overhead reaching because "there is no imaging during the period of Dr. Das's review indicative of abnormality imposing limitations with overhead reaching with the left upper extremity." (Tr. 1947).

On June 12, 2015, Dr. Mehta, who last saw Ms. Altman on April 30, 2015, opined Ms. Altman can sit, stand, and walk up to two hours in an eight-hour workday; perform hands-on, repetitive movements, including simple grasping and fine manipulation; lift up to ten pounds; remember work locations and procedures; maintain attention and concentration; carry out instructions; and interact with the general public. (Tr. 1029). Dr. Mehta opined Ms. Altman could not sustain an ordinary routine or perform activities on a schedule. (*Id.*). The ALJ did not assign weight to Dr. Mehta's opinion but concluded the examination on April 30 did not support the assessed limitations. (Tr. 1945). The ALJ noted Ms. Altman's reports of lumbar and knee pain and SI joint paint but emphasized a prior MRI showing mild facet issues and a slight disc bulge, normal upper and lower extremity EMGs, and physical examinations showing normal lower extremity muscle strength and tone. (*Id.*).

On August 31, 2017, Dr. Safko assessed Ms. Altman's physical functional capacity and opined she could lift twenty-two pounds; occasionally climb, balance, and crawl; rarely stoop or kneel; occasionally perform tasks involving reaching and pushing/pulling; experienced moderate pain that would cause absenteeism; and required additional unscheduled rest periods during an eight-hour workday. (Tr. 1504-05). Dr. Safko did not identify medical findings supporting her assessment. (*Id.*). The ALJ gave some weight to Dr. Sakfo's opinion but little weight to her opinions regarding absenteeism and additional work breaks because the assessment "is based on subjective rather than objective evidence" and did not indicate the extent of Ms. Altman's absenteeism or the basis for, and frequency of, additional work breaks. (Tr. 1952).

*Mental Health Impairments*

On June 17, 2014, at the behest of the Ohio Division of Disability Determination (DDD), consultative examiner Judith Rosenthal, Ph.D., conducted a psychological examination. (Tr. 644-50). During the interview, she observed "symptoms of significant anxiety" including leg shaking, fidgeting with hands, a dysthymic affect, and agitated mood. (Tr. 647). Based on the interview, the limited information received from the DDD, and Ms. Altman's performance on sensorium and cognitive function testing, Dr. Rosenthal determined Ms. Altman would be expected to (1) be able to understand, remember, and carry out instructions; (2) have some difficulty in maintaining attention, pace, and completing tasks; (3) display some limitations in responding appropriately to co-workers or supervision; and (4) when stressed, would likely lash out at others or quit. (Tr. 648-49). The ALJ gave some weight to Dr. Rosenthal's opinion regarding Ms. Altman's functional limitations in concentration and interaction with others but declined to give weight to the opinion that Ms. Altman would be expected to understand, remember, and carry out instructions because during the interview Ms. Altman reported difficulty with memory and requested Dr. Rosenthal repeat instructions for sensorium and cognitive function testing. (Tr. 1945).

On June 26, 2014, state agency psychiatric consultant Janet Souder, Psy.D., determined Ms. Altman had moderate restrictions of activities of daily living, moderate difficulty in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and no repeated episodes of decompensation. (Tr. 261). Dr. Souder assessed Ms. Altman's mental residual functional capacity and determined she was moderately limited in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods of time, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable

number and length of rest periods such that she was limited to performing repetitive two-to-three step tasks. (Tr. 265). Dr. Souder determined Ms. Altman was moderately limited in her ability to interact appropriately with the general public such that she could perform tasks with limited superficial contact with others, including the general public. (Tr. 266). Based on Ms. Altman's moderately limited ability to respond appropriately to changes in the work setting she opined Ms. Altman could perform tasks in a setting with static job duties where changes could easily be explained. (*Id.*).

On reconsideration, state agency psychiatric consultant Karla Voyten, Ph.D., adopted Dr. Souder's assessment. (Tr. 296-97). The ALJ gave great weight to the opinions because they were consistent with Ms. Altman's statements about interacting with others and with Dr. Rosenthal's observations about low performance on digit recall. (Tr. 1946).

On March 30, 2015, Dr. Kane completed a medical source statement and opined Ms. Altman could frequently maintain attention and concentration for extended periods of two-hour segments; respond appropriately to changes in routine settings; maintain regular attendance and be punctual within customary tolerance; deal with the public; deal with work stress; complete a normal workday and workweek without interruption from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember, and carry out complex, as well as detailed but not complex, job instructions; manage schedules and funds; and leave home on her own. (Tr. 1027-28). She determined Ms. Altman could occasionally socialize. (Tr. 1028).

She concluded Ms. Altman was unlimited in her abilities to understand, remember, and carry out simple job instructions, follow work rules, use judgment, interact with supervisors,

30

function independently without redirection, work in coordination or proximity with others with being distracted by them or distracting to them, maintain appearance, behave in an emotionally stable manner, and relate predictably in social situations. (Tr. 1027-28). The ALJ largely afforded great weight to Dr. Kane's opinions except as to those regarding dealing with the public and interacting with supervisors, emphasizing the inconsistency of the opinion with Ms. Altman's reported difficulty with interacting with others. (Tr. 1945).

On October 6, 2016, Nurse Shahan filled out the same form as Dr. Kane. (Tr. 1393-94). She opined Ms. Altman could frequently deal with the public; relate to co-workers; interact with supervisors; function independently without redirection; understand, remember, and carry out complex, as well as detailed but not complex, job instructions; maintain appearance; socialize; behave in an emotionally stable manner; and relate predictably in social situations. (*Id*.). She determined Ms. Altman could occasionally maintain attention and concentration for extended periods of two-hour segments, respond appropriately to changes in routine settings, maintain regular attendance and be punctual within customary tolerance, work in coordination or proximity with others with being distracted by them, deal with work stress, and complete a normal workday and workweek without interruption from psychologically based symptoms. (*Id*.). She concluded Ms. Altman was unlimited in her abilities to follow work rules; use judgment; understand, remember, and carry out simple instructions; manage funds and schedules; and leave home on her own. (*Id*.). The ALJ gave some weight to the opinion but noted "she assessed that the claimant could deal with the public, relate to coworkers and interact with supervisors frequently, and understand, remember, and carry out complex and detailed instructions." (Tr. 1945).

THE ALJ'S DECISION

31

The ALJ's decision included the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through March 31, 2015.

2.     The claimant has not engaged in substantial gainful activity since April 8, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, degenerative lumbar spinal stenosis, lumbar radiculopathy, right knee meniscal tear, bilateral sacroiliitis, obesity, BMI 42.7, fibromyalgia, asthma, long term prescription opiate use, depression and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.     After careful consideration of the entire record, from April 8, 2010, through August 28, 2017, I find that the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except, she could never climb ladders, ropes or scaffolds. She could frequently climb ramps or stairs, frequently stoop and crawl. Avoid the use of moving machinery, commercial driving and unprotected heights. Perform simple, routine and repetitive tasks that could be performed at the SVP 1-2 level. The work environment must be free of fast-paced production requirements and involve only routine workplace changes. She could have occasional contact with the public, occasional interaction with co-workers and superficial contact with others, defined as no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others or being responsible for the safety and welfare of others.

6.     After careful consideration of the entire record, beginning August 29, 2017, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except, she can never climb ladders, ropes or scaffolds, occasionally climb ramps or stairs, occasionally balance, stoop, kneel, crouch and never crawl. Have occasional exposure to pulmonary irritants such as fumes, dusts, gases, odors, and poor ventilation. Avoid the use of moving machinery, commercial driving and unprotected heights. Perform simple, routine and repetitive tasks that can be performed at the SVP 1-2 level. The work environment must be free of fast-paced production requirements and

32

involve only routine workplace changes. She can have occasional contact with the public, occasional interaction with co-workers and superficial contact with others, defined as no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others or being responsible for the safety or welfare of others.

7.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.    The claimant was born on June 14, 1978, and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9.    The claimant has a limited education (20 CFR 404.1564 and 416.964).

10.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968)

11.   From April 8, 2010, through August 28, 2017, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12.   From August 29, 2017, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in insignificant numbers in the national economy that the claimant can perform. (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

13.   The claimant has not been under a disability, as defined in the Social Security Act, from April 8, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 1938-54).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is

more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.

2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in

the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Ms. Altman alleges the ALJ violated the treating physician rule by "erroneously discounting" one treating physician's opinion and failing to identify the weight assigned to another treating physician's opinion. (Pl.'s Br., ECF #9, PageID 3027-28). Ms. Altman also claims the ALJ failed to incorporate her need for a cane and consider her off-task behavior when assessing her residual functional capacity (RFC). (*Id.* at PageID 3028). In response, the Commissioner states the ALJ provided good reasons supported by substantial evidence for the evaluation of all medical opinions. (Comm'r's Br., ECF #10, PageID 3052). The Commissioner also states the ALJ's RFC is supported by substantial evidence. (*Id.*).

**A.    Treating Physician Rule**

In evaluating medical opinions in cases filed before March 27, 2017, an ALJ must give the medical opinion of a claimant's treating physician "controlling weight" if "it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record.[1] 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Wilson v.*

---

[1]    If one claim is pending when another is filed and the two are then consolidated, the date of filing for purposes of evaluating opinion evidence is the earliest filing date. *See* U.S. Social Security Administration § DI 24503.050D.2.a. Ms. Altman filed her first claim in May 2014, and therefore the treating physician rule applies to the consolidated claims even though her

*Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). This was commonly known as the "treating physician rule." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). The rationale for the rule is simple: Because treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone," their opinions are generally accorded more weight than those of non-treating physicians. *Id.* (quoting 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)).

In addition to the treating physician rule, an ALJ must abide by the "good reasons requirement." *Fox v. Comm'r of Soc. Sec.*, 827 F. App'x 531, 536 (6th Cir. 2020). "Separate from the treating physician rule, but closely related, is the requirement that the ALJ 'always give good reasons' for the weight ascribed to a treating-source opinion." *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 552 (6th Cir. 2020) (quoting 20 C.F.R. § 404.1527(c)(2), 416.927(c)(2)); *see also* SSR 96-8p, 1996 WL 374184, at *7 ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). To satisfy the requirement, the ALJ's reasons must be sufficiently specific so as to help "claimants understand the disposition of their cases," and "permit[ ] meaningful appellate review of the ALJ's application of the [treating physician] rule." *Rogers*, 486 F.3d at 242-43 (quotation omitted); *see* SSR 96-2p, 1996 WL 374188, at *5.

The ALJ "may not summarily discount a treating-source opinion as not well-supported by objective findings or being inconsistent with the record without identifying and explaining how

---

subsequent claim was filed in 2018. *See, e.g., Beulah v. Comm'r of Soc. Sec.*, No. 1:20-CV-02271, 2022 WL 1609236 at *22 (N.D. Ohio, Mar. 25, 2022).

the substantial evidence is purportedly inconsistent with the treating-source opinion." *Hargett*, 964 F.3d at 552; *see also Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) (per curiam). If the ALJ decides not to give the treating physician's opinion controlling weight, she must determine the weight to give the opinion by looking at other factors, including "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, consistency if the opinion with the record as a whole, and any specialization of the treating physician." *Fox*, 827 F. App'x at 536 (quoting *Blakely*, 581 F.3d at 406); *see also* 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), (3)-(6). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. "Even if the treating physician's opinion is not given controlling weight, 'there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference.'" *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir.2009) (quoting *Rogers*, 486 F.3d at 242). Failure to assign a specific weight to the treating physician's assessment "alone constitutes error." *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011). These procedural requirements are "not simply a formality" and are intended "to safeguard the claimant's procedural rights. *Id.* at 937. As a result, courts will remand "when we encounter opinions from ALJs that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." *Wilson*, 378 F.3d at 545.

Even if substantial evidence supports the ALJ's weighing of each of the treating physician opinions, "substantial evidence alone does not excuse non-compliance with 20 C.F.R. § 404.1527(c)(2) as harmless error." *Blakley*, 581 F.3d at 410; *Wilson*, 378 F.3d at 546 ("A court cannot excuse the denial of a mandatory procedural protection simply because, as the

Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion . . ."). A violation of the treating physician rule might be harmless error if (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "where the Commissioner has met the goal of § 404.1527(d)(2)–the provision of the procedural safeguard of reasons–even though [he] has not complied with the terms of the regulation." *Wilson* 378 F.3 at 547. "In the last of these circumstances, the procedural protections at the heart of the rule may be met when the 'supportability' of a doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked elsewhere in his analysis of another physician's opinion or the analysis of the claimant's ailments." *Nelson v. Comm'r of Soc. Sec.,* 195 F. App'x 462, 470-72 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 F. App'x 456, 464 (6th Cir. 2006).

### 1. Dr. Safko's Medical Opinion

The ALJ assigned only partial weight to Dr. Safko's opinion because the opinion as to unscheduled breaks was not supported by evidence in the record, was based on subjective evidence, and did not indicate why or how often Ms. Altman required additional unscheduled breaks. (Tr. 1952). Ms. Altman claims the ALJ's "conclusion is equivalent to the ALJ playing doctor and is not supported by the medical evidence." (ECF #9 at PageID 3029). However, the reasons identified by the ALJ are sufficient reasons to discount a treating physician's opinion. *See Wilson,* 378 F.3d at 544-45. Additionally, Ms. Altman has not alleged the ALJ incorrectly applied the appropriate legal standard, but instead argues the medical record is consistent with the limitations proffered by Dr. Safko, citing Ms. Altman's consistent reports of pain, and other

symptoms of anxiety, sleep disturbances, low energy, poor concentration, poor appetite, and some suicidal ideation. (ECF #9 at PageID 3031). Ms. Altman does not claim the ALJ did not consider these reported symptoms but rather presents them as evidence weighing in favor of an opposite conclusion to that reached by the ALJ.

This is tantamount to requesting the Court reach a different conclusion based on the same evidence considered by the ALJ, which is something this Court cannot do. It bears repeating that when the Court evaluates the Commissioner's findings it does not review the evidence *de novo*, make credibility determinations, or weigh the evidence, *see Brainard,* 889 F.2d at 681, nor can the Court overturn an ALJ's conclusions that are supported by substantial evidence, even if the evidence could also support a claimant's position, *see Jones,* 336 F.3d at 477.

Next, Ms. Altman claims the ALJ failed to consider the frequency of Ms. Altman's medical appointments. (ECF #9 at PageID 3031). In her estimation, the frequency of the visits would cause her to miss work on a regular basis. (*Id.*). It is true that "[a]bsenteeism due to the frequency of ongoing treatment is a relevant factor for ALJ consideration so long as the treatment is medically necessary and concerns the conditions on which a disability claim is founded." *Griffin v. Comm'r of Soc. Sec.,* No. 2:150cv013715, 2017 WL 991006, at *2 (E.D. Mich. Mar. 15, 2017); *see White v. Comm'r of Soc. Sec.,* No. 17-cv-12344, 2018 WL 2452209, at *7 (E.D. Mich. Apr. 10, 2018).

But Ms. Altman never raised absenteeism as an issue before the agency. During the hearing, neither the ALJ nor Ms. Altman's counsel asked the VE about a hypothetical employer's tolerance for absenteeism or whether the frequency of Ms. Altman's medical appointments would surpass the hypothetical employer's tolerance. Ms. Altman's counsel did not mention the issue in her brief to the Appeals Council. (*See* Tr. 2336-38). Because "[i]t is axiomatic that 'a court should

not consider an argument that has not been raised in the agency proceeding that preceded the appeal,'" *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 810 (6th Cir. 2012) (citation omitted), I do not consider this particular argument.

### 2.    Dr. Mehta's Medical Opinion

Ms. Altman next claims she is entitled to remand because the ALJ did not assign specific evidentiary weight to Dr. Mehta's medical opinion. (ECF #9 at PageID 3031-32). As an initial matter, the ALJ erred in failing to indicate what weight, if any, was given to Dr. Mehta's opinion. *See Cole,* 661 F. 3d at 938 (failing to specify the weight assigned to the opinion of a treating physician constitutes error, as "[a] finding that a treatment source medical opinion . . . is not entitled to controlling weight [does] not [mean] that the opinion should be rejected."). However, such a failure may be excused as harmless "[s]o long as the decision permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion." *Francis v. Comm'r of Soc. Sec.,* 414 F. App'x 802, 805 (6th Cir. 2011) (internal citations omitted).

Here, despite not assigning weight to Dr. Mehta's opinion, the ALJ made clear the reasons for discounting the opinion: (1) Ms. Altman's physical examinations do not support the limitations; (2) the lumbar MRI, of which Dr. Mehta was aware and interpreted as "essentially fine," did not support the limitations; and (3) the limitations were inconsistent with other objective medical evidence in the record, including normal upper and lower EMG studies. (Tr. 1945). The ALJ's evaluation provides the reviewing court a clear understanding of the reasons given to discount the opinion; therefore, the ALJ's failure to articulate the weight assigned to Dr. Mehta's opinion is harmless error.

**B.** **The RFC Assessment**

Ms. Altman claims the ALJ should have recognized limitations for off-task time and her need for a cane when assessing her RFC. (ECF #9 at PageID 3033-34). The RFC assessment must be based on all of the relevant evidence in the case record. SSR 96-8p, 1996 WL 374184.

As to the off-task limitation, Ms. Altman has pointed to medical opinions and other evidence supporting her contention that the ALJ should have recognized Ms. Altman would be off-task based on Ms. Altman's reports of trouble with attention and concentration and the opinions of Drs. Rosenthal, Souder, and Voyten, and Nurse Shahan. (*Id.* at PageID 3033-34). As noted above, Dr. Rosenthal concluded "she would be expected to have some difficulty maintaining attention, pace and completing tasks"; Drs. Souder and Voyent determined she was moderately limited in maintaining concentrating, persistence or pace and, therefore, limited her to performing repetitive two- to three-step tasks; and Nurse Shahan opined Ms. Altman has the occasional ability to maintain attention and concentration for extended periods. Ms. Altman claims "the weight of this evidence supports incorporating a limitation of off task behavior[.]" (*Id.* at PageID 3034). Ms. Altman did not identify any additional evidence supporting her position that the ALJ failed to consider or argue the ALJ's evaluation is not supported by substantial evidence; instead, she claims "the weight of the evidence supports incorporating a limitation of off-task behavior[.]" (*Id.*). Ms. Altman's argument is a request that the Court reweigh the evidence and reach a different conclusion than that of the ALJ and fails to cite sufficient medical evidence justifying a finding that Ms. Altman would be off-task to a work-preclusive extent.

Ms. Altman next argues the ALJ erred by failing to incorporate Ms. Altman's need for a cane into the RFC. (ECF #9 at PageID 1034). The Sixth Circuit has determined that if a "cane [is]

not a necessary device for a claimant's use, it cannot be considered an exertional limitation that reduced [his] ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). To be "medically required," the record must include "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed. (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 1996 WL 374185, at *7.

Here, the record shows Ms. Altman was prescribed a cane in September 2017. (Tr. 1641). However, the ALJ noted there was "limited documentation regarding the use of an assistive device." (Tr. 1948). Moreover, Ms. Altman testified to using a cane but, in review of the medical record, did not present using a cane for ambulation or balance. Because the record does not include the required information, the ALJ appropriately declined to incorporate the need for a cane into Ms. Altman's RFC.

I find the ALJ's RFC assessment, particularly the limitations to perform simple, routine, and repetitive tasks and occasional interaction with the public and co-workers, is supported by substantial evidence and sufficiently addresses Ms. Altman's moderate difficulties with attention and concentration. Moreover, based on the lack of evidence necessary to establish that a cane is "medically required," the ALJ appropriately declined to incorporate the need for a cane.

43

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: July 7, 2023

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).